**In the United States District Court
for the District of Kansas**

———————

Case No. 25-cr-40024-TC

———————

UNITED STATES OF AMERICA,

*Plaintiff*

v.

STEVEN MARK DUCA,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Steven Duca is charged with two counts of possession of cocaine and methamphetamine with intent to distribute. Doc. 1; *see* 21 U.S.C. § 841(a)(1). He moves to suppress evidence uncovered during a traffic stop. Doc. 17. For the following reasons, that motion is denied.

**I**

**A**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (recognizing incorporation against the states). Absent a recognized exception, the Fourth Amendment prohibits suspicionless seizures or warrantless searches that violate a person's objectively reasonable expectation of privacy by invading a constitutionally protected space or thing. *United States v. Jones*, 565 U.S. 400, 406 (2012); *see also United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). Traffic stops are seizures for Fourth Amendment purposes, *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015), and in a traffic stop "a passenger is seized as well and so may challenge the constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007).

A warrantless stop is valid where the officer has reasonable suspicion to believe that a traffic violation occurred. *Kansas v. Glover*, 589 U.S. 376, 380 (2020). In particular, the officer must have "a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Salas*, 756 F.3d 1196, 1201 (10th Cir. 2014) (quotation marks omitted). The stop also must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Morales*, 961 F.3d 1086, 1090–91 (10th Cir. 2020).

Ordinarily, the traffic stop is circumscribed by the traffic violation giving rise to the initial encounter. That means officers may conduct unrelated inquiries during a stop only if that conduct does not prolong the stop. *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). For example, it is accepted that officers may reasonably inquire as to the driver's license, automobile's registration and proof of insurance, identity of the individuals, and driver's travel plans. *United States v. Cates*, 73 F.4th 795, 806 (10th Cir. 2023) (citations omitted). But once the mission of the stop has concluded, the motorist is generally free to leave. *Morales*, 961 F.3d at 1091.

There are, of course, justifications for continued detention. For example, the driver may consent to further questioning. *United States v. Woody*, 45 F.4th 1166, 1173 (10th Cir. 2022). Or an officer may develop reasonable suspicion of other illegal activity distinct from the traffic violation. *See United States v. Munoz*, 162 F.4th 1210, 1219 (10th Cir. 2025). "To satisfy the reasonable suspicion standard, an officer need not 'rule out the possibility of innocent conduct,' or even have evidence suggesting 'a fair probability' of criminal activity." *Pettit*, 785 F.3d at 1379 (citations omitted). Instead, the officer needs only "a particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *Munoz*, 162 F.4th at 1219 (quotation marks omitted); *see id.* at 1222 (finding that police developed reasonable suspicion of criminal activity after initiating a traffic stop based on the totality of the circumstances). A non-exhaustive list of factors that the Tenth Circuit has recognized as supporting reasonable suspicion include nervousness, unusual travel plans, criminal history, and travel route. *See id.* at 1220–22; *see also Pettit*, 785 F.3d at 1380–83 (holding that no one factor is determinative of reasonable suspicion of illegal activity). Accordingly, an officer who develops reasonable suspicion of

illegal activity "may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Pettit*, 785 F.3d at 1379–80 (quoting *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)) (emphasis in original).

As a general matter, the authority to detain a motorist while investigating reasonable suspicion does not include the right to search the vehicle. Instead, a search of the vehicle must be justified by, for example, probable cause. *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023); *see also United States v. Pinder*, 121 F.4th 1367, 1371 (10th Cir. 2024) (allowing contemporaneous search incident to a lawful arrest). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Phillips*, 71 F.4th at 823 (quotation marks omitted). When an officer smells drugs, such as marijuana emanating from the vehicle, that observation is "entitled to substantial weight in the probable cause analysis and can be an independently sufficient basis for probable cause." *Id.* (quotation marks omitted). Additional observations—such as nervous behavior and vague travel plans—obviously strengthen the existence of probable cause. *See Munoz*, 162 F.4th at 1220–22.

**B**

In March 2025, Geary County Sheriff's Deputy Nicholas Blake received a phone call from a deputy with the Saline County, Nebraska Sheriff's Office.[1] The deputy told Blake about a Toyota Corolla that had made a quick roundtrip from Indiana to California. In particular, license plate data showed that the rented Corolla had traveled to California, that it remained in California for only twenty-nine hours, and was taking a different route back toward Indiana (Interstate 70) than it used traveling out to California (Interstate 80). Based on his training and experience, these factors fit certain drug trafficking criteria that, according to Blake, made the Corolla a good candidate for an

---

[1] The following facts were found based on the witness's testimony and the evidence produced at the suppression hearing.

interdiction stop. Accordingly, Blake decided that he would stop the Corolla when it entered his area of operation.[2]

Blake parked on Interstate 70 near mile marker 290 to wait for the Corolla to pass by him. When it drove past him, he pulled out behind it. He observed the Corolla commit what he believed were three violations of a Kansas traffic law concerning the utilization of a turn signal. In particular, K.S.A. § 8-1548(b) provides, in material part, as follows: "A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning." The first alleged violation occurred when he saw the Corolla move right to the highway exit lane without signaling for 100 feet prior to its movement. Ex. CF6 at 20:11:32.[3] Second, he saw it turn left onto a street leading to a shopping center parking lot—Lacy Drive—without giving a proper signal. Ex. CF6A at 20:12:34. Third, it turned left onto a parking lot in the shopping center, again without signaling for the requisite 100 feet. *Id.* at 20:12:55.

Based on these perceived infractions, Blake activated his lights and initiated a stop of the Corolla. Defendant Duca was driving the Corolla and Shantelle Rose was in the passenger seat. Blake approached the Corolla and requested Duca's driver's license and the rental agreement. As Duca handed over his license, Blake noticed that Duca was nervous and uneasy; his hand was shaking visibly. Rose explained that she had to search for the rental agreement on her phone, so Blake went to his patrol car to run a Triple I check of Duca's license through dispatch.

Blake then returned to the Corolla. Rose showed Blake a rental confirmation email, which noted that the Corolla was due back in Indiana the following day. Blake asked the pair what they were doing in

---

[2] The Fourth Amendment generally forbids roving patrols. *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973). But pretextual stops are not impermissible. *Whren v. United States*, 517 U.S. 806, 811 (1996). Moreover, "[i]t is irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Phillips*, 71 F.4th at 822. Blake expressly admitted that he decided he would stop the Corolla, and he parked on Interstate 70 waiting for it to pass by his location in the hopes that he would find a legal basis to do so. Duca makes no argument that this behavior was unlawful.

[3] These citations refer to exhibits that were filed conventionally. *See* Doc. 33-2.

Kansas. They responded that they were visiting friends in Colorado. Given the license plate data, Blake knew this to be a lie. At this point, based on a combination of the Corolla's quick roundtrip to California, the different routes to and from, the length of stay out west, the vehicle's due date in Indiana the next day, Duca's nervousness, and the pair's lies about their travel plans, Blake suspected that criminal activity was afoot. Based on his suspicion, Blake deployed his canine partner, Chera, to investigate.

Chera alerted to the odor of narcotics in the Corolla. Blake left the area and made Chera sniff again, and she alerted a second time. Blake then searched the Corolla and found twenty-six pounds of methamphetamine and one kilogram of cocaine.

The United States indicted Duca, charging him with possession of methamphetamine and cocaine with the intent to distribute. Doc. 1.[4] Duca moves to suppress. Doc. 17. He makes two principal arguments: that Blake lacked reasonable suspicion to initiate a traffic stop, *id.* at 4, and that he unreasonably prolonged the stop, *id.* at 5. The Government opposes each argument. Doc. 18. Blake testified and was subject to cross-examination at an evidentiary hearing that was held on April 30, 2026. Doc. 30.

## II

Blake had reasonable suspicion to stop the Corolla. And he did not unreasonably prolong the stop. Accordingly, Duca's motion is denied.

## A

Duca first argues that the stop was unlawful at its inception. Doc. 17 at 4. That argument fails because Blake, based on his observation of the vehicle, had reasonable suspicion to believe the rented Corolla had violated a Kansas traffic law.

Kansas law requires that "a signal of intention to turn or move right or left . . . shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning." Kan. Stat. Ann. § 8-1548(b). Blake credibly testified that he saw the Corolla

---

[4] All document citations are to the document and page number assigned in the CM/ECF system.

move one lane to the right and make two left turns without a proper signal. His dashboard camera video confirms as much. The parties dispute the length of Duca's signals, but there is no question that he signaled for less than 100 feet. In particular, the second signal—when Duca turned left onto Lacy Drive—occurred almost at the very moment the turn began. That evidence, standing alone, is sufficient to support Blake's finding of reasonable suspicion that the Corolla violated Section 8-1548(b). *Phillips*, 71 F.4th at 823 (finding that officer's observation of the defendant committing a traffic violation was "sufficient to support the traffic stop"); *State v. Gilliland*, 490 P.3d 66, 71 (Kan. Ct. App. 2021) (finding that police had reasonable suspicion to conduct a traffic stop when the officers observed the defendant turn left without signaling).

The parties also dispute what the law requires. Duca contends that Section 8-1548(b) requires a signal for 100 feet before a motorist crosses into another lane regardless of the motorist's movement toward the other lane.[5] On the other hand, Blake and the Government contend that motorists must signal for 100 feet before they make *any* movement right or left, meaning that one who *begins* to change lanes without signaling for 100 feet—even if he only moves right or left within a lane and does not ultimately change lanes—has violated Section 8-1548(b).

It is unnecessary to resolve this dispute. Even if Duca is correct that Section 8-1548(b) requires a signal for 100 feet before a motorist physically crosses into another lane, the evidence offered at the suppression hearing showed that Blake reasonably suspected the Corolla of failing to do precisely that. His dashboard camera confirms that conclusion. *See Gilliland*, 490 P.3d at 71 (finding that the officer's observation of a turn without the proper signal was sufficient to initiate a traffic stop).

Duca's argument establishes, at best, that there would be insufficient evidence to establish beyond a reasonable doubt that he violated

---

[5] Duca invoked *State v. Marx*, 215 P.3d 601 (Kan. 2009), in support of his argument at the suppression hearing. Given that *Marx* dealt with a different statute—Kan. Stat. Ann. § 8-1522—its relevance to this case is not immediately clear. *See* 215 P.3d at 606. In any event, Blake had reasonable suspicion to stop the Corolla even if Duca's construction of Section 8-1548(b) is correct.

Section 8-1548(b). But establishing guilt beyond a reasonable doubt is not the inquiry for purposes of reasonable suspicion: The pertinent inquiry is whether Blake had an objectively reasonable basis to *suspect* that the Corolla failed to signal as required. *See United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) ("[R]easonable suspicion may rely on information less reliable than that required to show probable cause, and it need not be correct.") (citation omitted). Blake's testimony established that he had such a basis.

**B**

Duca also argues that suppression is required because Blake unreasonably extended the stop. Doc. 17 at 5 (invoking *Rodriguez v. United States*, 575 U.S. 348 (2015)). He contends that Blake deviated from the mission of the traffic stop three times: First when he ran a Triple I check through dispatch; second when he asked about the pair's travel plans; and third when he deployed Chera. *Id.* at 6. But none of these actions impermissibly prolonged the stop.

As noted, a traffic stop constitutes a Fourth Amendment seizure and, as a result, must be reasonable. *United States v. Baker*, 108 F.4th 1241, 1246 (10th Cir. 2024). This means that it must be "justified at its inception and . . . the officer's actions during the stop must be reasonably related in scope to 'the mission of the stop itself.'" *Id.* (quoting *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020)).

In *Rodriguez*, the Supreme Court held that a traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete" it. *Baker*, 108 F.4th at 1246–47 (citing *Rodriguez*, 575 U.S. at 350–51) (citations omitted). And while there is no de minimis exception to the rule, *Mayville*, 955 F.3d at 830, the question is only whether "police diligently pursued the [traffic] investigation," *Rodriguez*, 575 U.S. at 354, and not whether they took the quickest route humanly possible to concluding the stop. *Mayville*, 955 F.3d at 827. Thus, courts are not permitted to "second-guess the logistical decisions of officers so long as their actions were reasonable and diligently completed within the confines of a lawful traffic stop[ ] . . . because reasonableness—rather than efficiency—is the touchstone of the Fourth Amendment." *Id.*

The Tenth Circuit has established a three-part test for analyzing the lawfulness of a delay under *Rodriguez*. In particular, an unlawful seizure occurs when an officer diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, does so in a way that

7

"prolongs" (i.e., adds time to) the stop, and the investigative detour is unsupported by any independent reasonable suspicion. *Baker*, 108 F.4th at 1248. That means "the government prevails if the officers' actions did not divert from the traffic mission, the search was not prolonged, or reasonable suspicion existed." *Id.* In other words, an officer's conduct does not offend the Fourth Amendment if he or she has, at a minimum, reasonable suspicion of criminal wrongdoing. *Id.* at 1247 (citing *Mayville*, 955 F.3d at 830). The moment reasonable suspicion becomes necessary is referred to as the *Rodriguez* moment. *Leon*, 80 F.4th 1160, 1165 (10th Cir. 2023) (citing *United States v. Batara-Molina*, 60 F.4th 1251, 1255 n.1 (10th Cir. 2023)).

Although the Government bears the burden of satisfying the reasonable suspicion standard, it is not an onerous one. *Munoz*, 162 F.4th at 1219 (citing *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015)). Courts frequently describe the minimal standard of reasonable suspicion by contrasting it with the easy-to-satisfy probable cause: Where probable cause requires a "substantial chance of criminal activity," *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983), reasonable suspicion requires only "some minimal level of objective justification," *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

The inquiry depends on "the totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Cortez*, 449 U.S. 411, 417 (1981)). The emphasis is on the "whole picture," *Cortez*, 449 U.S. at 417, and rejects a "divide-and-conquer analysis" of a situation's relevant factors, *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Reasonable suspicion "depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act," allowing officers to make "commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 589 U.S. 376, 380–81 (2020) (emphasis in original) (cleaned up).

This low bar has been explained in recent Supreme Court cases concerning the greater intrusion of stopping a motor vehicle's travel. For example, the Supreme Court held an officer had reasonable suspicion to initiate a traffic stop for driving with a revoked license based on the fact that the registered owner of the vehicle had a revoked license even when it was unclear who was driving the vehicle. *Glover*, 589 U.S. at 381. More recently, the Supreme Court reversed a lower court's conclusion that reasonable suspicion for a traffic stop was lacking where an officer encountered a vehicle, its occupants fled the vehicle, and the driver began backing out of a parking space even though

a passenger door had been left open. *District of Columbia v. R.W.*, 2026 WL 1052344, 608 U.S. ___ (2026) (per curiam) (summarily reversing lower court's conclusion that reasonable suspicion was lacking). That makes sense given the purpose of an investigative detention is merely to dispel that suspicion. *See generally Cortez*, 449 U.S. at 421 (recognizing the purpose of the stop is limited by the suspicion).

Under this commonsense approach, "factors consistent with innocent travel may collectively amount to reasonable suspicion." *Leon*, 80 F.4th at 1165. Courts generally defer to the officer—the individual with specialized training and experience—to distinguish between innocent and suspicious behavior unless "an officer relies on a circumstance incorrigibly free of associations with criminal activity." *Id.* (quoting *Frazier*, 30 F.4th at 1174) (internal quotation marks omitted); *see also Cortez*, 449 U.S. at 419 ("[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion."). "As long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Munoz*, 162 F.4th at 1219–20 (quoting *Pettit*, 785 F.3d at 1379) (internal quotation marks omitted) (alterations in original). But an officer must point to the specific, articulable facts giving rise to reasonable suspicion; "inchoate suspicions and unparticularized hunches" will not do. *Leon*, 80 F.4th at 1165 (quoting *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010)).

Blake did not unreasonably extend the stop. *Contra* Doc. 17 at 6. The Tenth Circuit has explicitly held that an officer does not violate *Rodriguez* by conducting a Triple I check through dispatch. *Mayville*, 955 F.3d at 831. Neither is it a *Rodriguez* violation for an officer to ask travel plan questions. *Cates*, 73 F.4th at 806. Duca cites no authority to the contrary.

The totality of the circumstances supported Blake's determination of reasonable suspicion and justified deploying Chera. *See Frazier*, 30 F.4th at 1173 (noting that the rule in *Rodriguez*—that police may not unlawfully prolong a traffic stop—applies only when their investigative detour is "unsupported by any independent reasonable suspicion"). In particular, Blake knew that the Corolla had been rented, made a quick roundtrip to California, used different routes to travel to and from, and

9

was due back in Indiana the next day. He testified that based on his training and experience—both of which are entitled to deference— this behavior is often indicative of drug trafficking. *See United States v. Hayes*, 62 F.4th 1271, 1279 (10th Cir. 2023) (finding that police reasonably suspected the defendant of drug trafficking when he had, among other things, "made multiple short trips between [two distant cities]"); *accord United States v. Batara-Molina*, 60 F.4th 1251, 1257 (10th Cir. 2023) ("To make such a long trip—only to stay at the destination for such a short amount of time—is also consistent with the behavior of a drug courier."); *Pettit*, 785 F.3d at 1381 ("We have consistently held that implausible travel plans can contribute to reasonable suspicion.") (alterations omitted); *United States v. Kitchell*, 653 F.3d 1206, 1221 (10th Cir. 2011) (noting that the use of a rental car "can potentially contribute to an officer's reasonable suspicion of drug trafficking"). In addition, Duca and Rose lied about their travel plans, which further aroused Blake's suspicions. *Cf. United States v. Simpson*, 609 F.3d 1140, 1152 (10th Cir. 2010) (finding that evasiveness about travel plans contributed to reasonable suspicion). Moreover, Blake testified that Duca was extremely nervous, so much so that his hand was visibly shaking. This too served as a basis for reasonable suspicion. *See Pettit*, 785 F.3d at 1383 (finding that "abnormal nervousness" contributed to reasonable suspicion). These factors collectively established reasonable suspicion of drug trafficking warranting further investigation. As a result, Blake was justified in deploying Chera to confirm his suspicion. *See United States v. Mercado-Garcia*, 989 F.3d 829, 838–39 (10th Cir. 2021) (finding that an officer deployed a drug dog after he had reasonable suspicion of criminal activity based on similar facts).

## C

There is one additional issue that arose at the suppression hearing. Six months after filing his motion to suppress, Duca filed a pleading he called a supplement. Doc. 29. That document—for the first time— generally challenges the reliability of Chera's alert, arguing that the organization that certified Chera is not a bona fide organization and that Blake was predisposed to interpret Chera's behavior as an alert because he was motivated by the possibility of financial gain through civil asset forfeiture. *Id.* at 5, 29. The supplement contains roughly 486 pages of attachments whose relevance is difficult to discern.

This argument is rejected for two reasons. First, it has been waived. Supplemental briefing is for pertinent and significant authorities that could not have been found when the original brief was filed. *See* D.

Kan. R. CR1.3(c) (noting that notices must "state reasons for the supplemental citations"). It is not an avenue or an invitation to submit new arguments or authorities that could have and should have been raised earlier. *United States v. Romero*, 132 F.4th 1208, 1220 n.4 (10th Cir. 2025), *cert. denied*, 146 S. Ct. 176 (2025). If Duca wanted to challenge Chera's reliability, the time in which to do so was in his initial brief so that the Government could have responded to it and the issue could have been addressed at the hearing. His failure to do so inhibited the adversarial process and prevented the parties from meaningfully addressing that argument. *See United States v. Palmer*, 25-cr-40011 (D. Kan. Apr. 27, 2026), Doc. 37-1 at 29 (finding that untimely arguments and documents were waived).[6]

Second, it lacks merit even if it had been raised in a timely fashion. As noted, most of the documents Duca invokes do not relate to Chera's reliability. *See, e.g.*, Docs. 29-10, 29-11, 29-12, 29-13 (newspaper articles about civil asset forfeiture); Doc. 29-14 (power point presentation from a law enforcement class that Blake teaches); Doc. 29-21 (manual of an unrelated association that certifies canines). And those that do, along with any relevant arguments, have been previously rejected. *See Palmer*, 25-cr-40011, Doc. 37-1 at 22 (rejecting the same arguments that Duca now makes against Chera's reliability and Blake's integrity). Simply put, Duca's new arguments and documents do not overcome the evidence regarding Chera's reliability. *See id.* at 29 (explaining how these same documents, submitted in a different case regarding Blake and Chera, do not overcome the evidence of Chera's reliability).

### III

For the foregoing reasons, Duca's Motion to Suppress, Doc. 17, is DENIED.

---

[6] Duca suggested at the suppression hearing that his tardiness should be excused because he could not have procured the documents in his supplement earlier. Even assuming that were true, it does not change the result. Most of the documents in the supplement are, at best, only tangentially related to Chera's reliability. Those that are germane do not call Chera's reliability into question. *See Palmer*, No. 25-cr-40011, Doc. 37-1 at 29 (rejecting this same argument on the merits).

It is so ordered.


Date: May 15, 2026                           s/ Toby Crouse
                                            Toby Crouse
                                            United States District Judge